1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10    FAYE BRYANT,

11                        Plaintiff,

CASE NO. C04-1706 TSZ

12            v.

13    WYETH,                                        ORDER

14                        Defendant.

15        THIS MATTER comes before the Court on Defendants Pharmacia Inc., Pharmacia

16   and Upjohn Corporation ("Upjohn"), Wyeth LLC and Wyeth Pharmaceuticals, Inc.'s

17   (together "Wyeth") Motion for Summary Judgment, docket no. 89.[1]  Having reviewed the

18   memoranda, declarations, and exhibits submitted by the parties, the Court enters the

19   following order:

20

21   _____

22   [1] Pfizer Inc. was originally a party to the motion, but has since been dismissed as a defendant.
     (Docket no. 188).

23

ORDER - 1

1

## I.      Background

2      This is a prescription drug product liability case in which Plaintiff, Faye Bryant,

3 alleges that she developed breast cancer as a result of ingesting combined hormone

4 replacement therapy (CHRT) drugs manufactured by the Defendants.  CHRT consists of

5 two medications, estrogen and progestin ("E+P") that are prescribed in combination to

6 treat symptoms of menopause.  This case involves four drugs, Premarin, Provera, Cycrin,

7 and Prempro.  Premarin, an estrogen, Cycrin, a synthetic progestin with the generic name

8 medroxyprogesterone acetate ("MPA"), and Prempro, an estrogen and progestin

9 combination, are manufactured by Wyeth.  Provera, an MPA, is manufactured by

10 Upjohn.

11      Mrs. Bryant alleges that she took Premarin and Provera from 1994 until 1999, and

12 the combination drug Prempro from 2000 to 2003, to treat symptoms of menopause.

13 Mrs. Bryant was diagnosed with breast cancer in 2004, and thereafter instituted this

14 action on July 2, 2004.  Mrs. Bryant had breast surgery, underwent radiation

15 chemotherapy, and used the anti-estrogen drug Tamoxifen.

16      Mrs. Bryant is a resident of Washington.  She was prescribed and ingested the

17 drugs in Washington, and developed breast cancer in Washington.[2]  Wyeth is

18 incorporated in Delaware and does business in Washington, but its headquarters, sales

19 team, and women's health research facility are located in Pennsylvania.[3]

20

21  [2] See Declaration of Wendy S. Dowse at 138, 141 (docket no. 90, ex. 12).
   [3] See Deposition of Andrew Panagy at 37-41 (docket no. 146, ex. 5) (stating the executives,
22 directors, and marketing teams responsible for HT drugs are "all based in Collegeville,

23

ORDER - 2

1   Mrs. Bryant's Third Amended Complaint claims negligence and breach of express

2   warranty under the Washington Product Liability Act ("WPLA") and fraud, and requests

3   general and punitive damages.[4]   The pending motion seeks to dismiss the (1) punitive

4   damages claim as to Defendant Wyeth, (2) all claims against Defendant Upjohn for

5   failure of proof on product identification, (3) the fraud claim, and (4) breach of express

6   warranty claim under the WPLA.  The Court defers ruling on the fraud claim at this time

7   and addresses the remaining arguments below.

## II.   Standard of Review

9   The Court may grant summary judgment if no genuine dispute of material fact

10  exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

11  56(a).  The moving party bears the initial burden of demonstrating the absence of a

12  genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A

13  fact is material if it might affect the outcome of the suit under the governing law.

14

15

16  Pennsylvania"); Testimony of Bernard Poussot, *Nelson II v. Wyeth*, 1/23/07, at 67-68 (docket no.
146, ex. 3) (stating that Wyeth's principal office is in Pennsylvania and "a very important
17  research center in women's health in particular is headquartered . . . in Collegeville,
[Pennsylvania]."
[4] This motion for summary judgment and a prior motion for dismissal under Federal Rule of
18  Civil Procedure (FRCP) 9(b) and 12(b)(6) where filed by Defendants based on Mrs. Bryant's
Second Amended Complaint.  See docket nos. 70, 89.  In response to the Defendants' motion to
19  dismiss the Second Amended Complaint, the Court dismissed Mrs. Bryant's negligence and
negligent misrepresentation claims, but ruled that she could file an amended complaint pleading
20  a single cause of action for these claims under the WPLA.  Docket no. 118 at 1.  Plaintiff has
filed the Third Amended Complaint.  Docket no. 163.  The Third Amended Complaint contains
21  the same allegations concerning fraud and the request for punitive damages.  This motion is moot
with respect to the claims for negligence and negligent misrepresentation alleged in the Second
22  Amended Complaint.  See docket no. 118.

23

ORDER - 3

1    Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In support of its motion for

2    summary judgment, the moving party need not negate the opponent's claim, Celotex,

3    477 U.S. at 323; rather, the moving party is entitled to judgment if the evidence is not

4    sufficient for a jury to return a verdict in favor of the opponent, Anderson, 477 U.S. at

5    249.  To survive summary judgment, a non-moving party must "show through specific

6    evidence that a triable issue of fact remains on issues for which the nonmovant bears the

7    burden of proof at trial."  Walker v. Shansky, 28 F.3d 666, 670-71 (7th Cir. 1994), aff'd

8    sub nom. Walker v. Ghoudy, 51 F.3d 276 (7th Cir. 1995); see also Celotex, 477 U.S. at

9    324.  The adverse party must present affirmative evidence, which "is to be believed" and

10   from which all "justifiable inferences" are to be favorably drawn.  Id. at 255, 257.  When

11   the record, taken as a whole, could not lead a rational trier of fact to find for the non-

12   moving party, summary judgment is warranted.  See, e.g., Beard v. Banks, 548 U.S. 521,

13   529 (2006).

### III.   Discussion

**1. Punitive Damages**

16      Mrs. Bryant requests punitive damages only against defendant Wyeth.  Because

17   Washington law prohibits punitive damages, Mrs. Bryant argues that Pennsylvania's

18   punitive damages law applies to her fraud claim against Wyeth.[5]  Wyeth moves for

19   summary judgment as to punitive damages, arguing that Washington law applies.

20

21   _____

22   [5] Mrs. Bryant also requests punitive damages for her WPLA claims.  Third Am. Compl. ¶ 111.
     But Mrs. Bryant cites no authority to support the application of Pennsylvania's punitive damages

23

ORDER - 4

1    **(a) Applicable Choice of Law Rules**

2    In determining which state's law applies in a diversity action, federal courts must

3    apply the forum state's choice-of-law rules. Fields v. Legacy Health Sys., 413 F.3d 943,

4    950 (9th Cir. 2005) (quoting Patton v. Cox, 276 F.3d 493, 495 (9th Cir. 2002)).  Under

5    Washington's choice-of-law rules, local law applies unless it conflicts with the laws or

6    interests of another state. Seizer v. Sessions, 132 Wn.2d 642, 648-49 (1997).  A court

7    "may be required to apply the law of one forum to one issue while applying the law of a

8    different forum to another issue in the same case." Brewer, 447 F. Supp. 2d at 1175

9    (quoting 1 KELLY KUNSCH, WASHINGTON PRACTICE §2.21 (4th ed. 2006)).  If a conflict

10   exists, Washington courts apply the law of the state that has the most significant

11   relationship to the parties and occurrences with respect to a specific issue. Johnson v.

12   Spider Staging Corp., 87 Wn.2d 577, 580 (1976).

13   The "most significant relationship" test consists of two steps.  First, the Court

14   must consider the following contacts: (a) the place where the injury occurred, (b) the

15   place where the conduct causing the injury occurred, (c) the domicile, residence,

16   nationality, place of incorporation and place of business of the parties, and (d) the place

17   where the relationship, if any, between the parties is centered. Johnson, 87 Wn.2d at 581

18   (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971)).  Washington

19   courts' "approach is not merely to count contacts, but rather to consider which contacts

20   are most significant and to determine where these contacts are found." Id.  The Court

21   ───────────────────────────────────────────────

22   law to claims other than fraud.  The Court therefore concludes that Washington's prohibition on
     punitive damages applies to the WPLA claims.

23

ORDER - 5

1    "must evaluate the contacts both quantitatively and qualitatively. . . ."  Martin v.

2    Goodyear Tire & Rubber Co., 114 Wn. App. 823, 830 (2003), while applying the

3    following principles:

4           (a) the needs of the interstate and international systems, (b) the relevant
            policies of the forum, (c) the relevant policies of other interested states and
5           the relative interests of those states in the determination of the particular
            issue, (d) the protection of justified expectations, (e) the basic policies
6           underlying the particular field of law, (f) certainty, predictability and
            uniformity of result, and (g) ease in the determination and application of the
7           law to be applied.

8    RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (1971).

9           If these contacts are balanced, the second step is to consider "the interests and

10   public policies" of the concerned states.  Johnson, 87 Wn.2d at 582.  "The extent of the

11   interest of each potentially interested state should be determined on the basis, among

12   other things, of the purpose sought to be achieved by their relevant local law rules and the

13   particular issue involved."[6]  Southwell v. Widing Transp., Inc., 101 Wn.2d 200, 204

14   (1984); see also Zenaida-Garcia v. Recovery Sys. Tech., Inc., 128 Wn. App. 256, 263-64

15   (2005).

16          **(b)  Actual Conflict**

17          There is an actual conflict between the law of Washington and the law of

18   Pennsylvania with respect to punitive damages.  Washington does not allow punitive

19   damages unless expressly authorized by the legislature.  Barr v. Interbay Citizens Bank of

20   _____

21   [6] This second step often overlaps with the first step's consideration of the Restatement principles.
     See Kammerer v. W. Gear Corp., 96 Wn.2d 416, 422 (1981) (reasoning that California had an
22   interest in punishing the defendant because the fraudulent conduct that caused the injury
     occurred in California).

23

ORDER - 6

1    Tampa, Fla., 96 Wn.2d 692, 697 (1981) amended, 96 Wn.2d 692 (1982) (amending

2    holding as it pertains to jurisdictional issues, not choice of law).  Pennsylvania, on the

3    other hand, permits punitive damages for "conduct that is outrageous, because of the

4    defendant's evil motive or his reckless indifference to the rights of others."  Hutchison ex

5    rel. Hutchison v. Luddy, 582 Pa. 114, 121 (2005).[7]

6          **(c)  Most Significant Relationship**

7                **i.       Place Where the Injury Occurred**

8          In cases of personal injuries, Washington courts presume that the law of the place

9    of injury applies unless another contact is more significant.  Martin, 114 Wn. App. at 830

10   (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS §146 (1971)).  But in cases of

11   fraud and misrepresentation, the place of injury is often fortuitous, and "there may be

12   little reason in logic or persuasiveness to say that one state rather than another is the place

13   of injury . . . ."  Kelley v. Microsoft Corp., 251 F.R.D. 544 (W.D. Wash. 2008) (quoting

14   RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 cmt. e (1971)).  In Kelley, class

15   action plaintiffs alleged that Microsoft falsely advertised computers as "Windows Vista

16   _____

17   [7] The parties have not briefed whether the Court should apply Pennsylvania or Washington law
     to the substantive fraud claim.  "Where Washington law does not actually conflict with the
18   foreign jurisdiction's law except on the issue of damages, it may be appropriate to apply
     Washington substantive law to the liability analysis while applying a foreign jurisdiction's law
19   with respect to damages."  Specialty Surplus Ins. Co. v. Second Chance, Inc., C03-0927C, 2006
     WL 581024, at *1 (W.D. Wash. Mar. 8, 2006) (citing RESTATEMENT (SECOND) OF CONFLICT OF
20   LAWS § 171 reporter's note, cmt. d (1971)).  Here, it appears that Pennsylvania and Washington
     both require proof of the same essential elements of fraud by clear and convincing evidence.
21   Compare Elcon Const., Inc. v. E. Washington Univ., 174 Wn.2d 157, 166 (2012), with Ellison v.
     Lopez, 959 A.2d 395, 398 (Pa. Super. Ct. 2008).  This issue has not been addressed by the
22   pending motion and is deferred.

23

     ORDER - 7

1    Capable" when, in fact, the computers had more limited functions.  Id. at 548, 553.  The

2    Court found that the place of injury was fortuitous because Microsoft's "allegedly unfair

3    or deceptive acts caused injury throughout the country."[8]  Id. at 552.  As a result, the

4    Court applied the law of Washington, "where Defendant resides and created the allegedly

5    unfair or deceptive marketing scheme."  Id.

6        Here, Wyeth's allegedly fraudulent conduct in marketing and labeling its CHRT

7    drugs originated in Pennsylvania and caused harm throughout the country.[9]  For instance,

8    Mrs. Bryant alleges Wyeth knew that studies showed "an increased risk of breast cancer

9    in women on [C]HRT [at] any dose,"[10] but "shift[ed] media focus" and recruited

10   "credible third part[ies]" to "undermine/cast doubt on" studies that suggested an

11   increased cancer risk.[11]  Moreover, Mrs. Bryant alleges that Wyeth obstructed research

12   with tactics such as creating a task force to ensure that the International Agency for

13   Research on Cancer "does not develop a position on a definitive relationship between

14   breast cancer and estrogen therapy . . . ."[12]  Thus, while Mrs. Bryant suffered her personal

15   injury in Washington, the harm caused by Wyeth's nationwide marketing practices could

16   _____

17   [8] The class was later decertified in Kelley v. Microsoft Corp., C07-0475 MJP, 2009 WL 413509
     (W.D. Wash. Feb. 18, 2009).  However, the Court found that the location of the injury was
18   fortuitous regardless of whether the class was certified.  Kelley, 251 F.R.D. at 552.
     [9] See In re Prempro Products Liability Litigation, 230 F.R.D. 555, 573 (E.D. Ark. 2005)
19   (denying class action certification to multidistrict litigation plaintiffs from around the country
     who alleged that Wyeth committed fraud because each plaintiff had individual issues of law and
20   fact).
     [10] Internal Correspondence, (docket no. 146, ex. 38) (a letter between Wyeth employees
21   discussing the results of a recent study).
     [11] Confidential Memorandum, (docket no. 146, ex. 69) (discussing public relations response to a
22   recent study).
     [12] Internal Correspondence, (docket no. 146, ex. 68) (emphasis in original)

23

ORDER - 8

1 have happened anywhere.  The place of injury is therefore fortuitous, shifting the focus to

2 the location where the conduct causing the harm occurred.

3                    ii.        **Place Where the Conduct Occurred**

4          In Washington, the location where fraudulent conduct occurred is the most

5 significant contact for the issue of punitive damages.  See Kammerer, 96 Wn.2d at 422-

6 23; Singh v. Edwards Lifesciences Corp., 151 Wn. App. 137, 145 (2009).  In Kammerer,

7 a Washington company traveled to California and made fraudulent representations while

8 negotiating patent rights with the California-based plaintiffs.  96 Wn.2d at 422-423.

9 Washington's Supreme Court applied California's punitive damages law because

10 "California was the site of all negotiations between the parties and the place where any

11 fraudulent representations were made . . . ."  Id. at 422.

12          In a case even more on point, Washington's Court of Appeals, Division One,

13 applied California's punitive damages law against a California company whose

14 fraudulent conduct resulted in personal injury in Washington.  Singh, 151 Wn. App. at

15 140.  In Singh, the defendant designed and manufactured a heart monitor that

16 malfunctioned and destroyed the plaintiff's heart during surgery.  The plaintiff sued for

17 products liability, and the hospital filed a cross-claim against the defendant for fraud.

18 The plaintiff resided in Washington and was injured at a Washington hospital.  But the

19 defendant company learned of the defect through research conducted in California and

20 decided in California not to warn the product's users of the defect.  The court held that

21 California law applied because the "significant factor in Kammerer was the jurisdiction in

22 which the bad behavior—fraudulent misrepresentation—occurred."  Id. at 145.

23

ORDER - 9

1          Like the California conduct in <u>Singh</u>, Wyeth allegedly committed fraud in

2   Pennsylvania, resulting in personal injury to Mrs. Bryant in Washington.

3          In an attempt to distinguish <u>Singh</u>, Wyeth argues that this case is more similar to

4   <u>Barr v. Interbay Citizens Bank</u>, which was decided by the Washington's Supreme Court

5   on the same day as <u>Kammerer</u>.  <u>Barr</u>, 96 Wn.2d at 692.  There, the Washington plaintiff

6   sued a Florida bank for wrongfully repossessing his car and sought punitive damages

7   under Florida law.  The court declined to apply Florida's punitive damages law because

8   the "actual conduct and the acts which might warrant punitive damages were restricted to

9   Nevada and Washington."  <u>Id.</u> at 699.  The court explained that the bank hired persons in

10  Nevada who repossessed and then failed to timely return the car in Washington.

11         Here, Mrs. Bryant alleges that Wyeth sales representatives misrepresented off-

12  label benefits of HT drugs to her doctors in Washington.  Wyeth denies that its

13  representatives were untruthful but nonetheless asserts that these allegations are a

14  significant Washington contact, like the location of the repossession in <u>Barr</u>.  But the

15  representations of Wyeth's sales representatives are, at most, a minor component of the

16  fraudulent behavior alleged by Mrs. Bryant.  For example, Dr. Cuda testified that sales

17  representatives were a source of information "generally speaking," but did not remember

18  specific fraudulent statements or otherwise credit sales representatives with informing her

19  of incorrect information regarding the benefits of E+P.[13]  Dr. McGill testified that Wyeth

20

21  _____

22  [13] Dr. Cuda testified that she believed HT drugs "decreased the risk of heart attacks" and
    Alzheimer's.  Deposition of Dr. Cuda at 155-156 (docket no. 146, ex. 77).  However, Dr. Cuda

23

ORDER - 10

1 sales representatives recommended Prempro for both controlling symptoms of

2 menopause and for off-label cardiovascular and osteoporosis benefits, but confirmed that

3 information from sales representatives was only "one of the things that [he] considered in

4 making [his] calculus as to the risks and benefits of the drug."[14]

5       Instead, the bulk of the conduct at issue is the extensive fraudulent

6 misrepresentations allegedly made from Wyeth's Pennsylvania headquarters.  Wyeth

7 created its product labels[15] and marketing strategies[16] in Pennsylvania.  For example, the

8 FDA told Wyeth to update the breast cancer warnings on its Prempro label,[17] but Wyeth

9 allegedly continued to misrepresent the drug's risks and responded to the FDA by paying

10 a doctor to object to the FDA's proposed warnings without disclosing the doctor's

11 financial relationship with Wyeth.[18]  Notably, the FDA letter was sent to Wyeth in

12

13

14

15 _____

16 does not connect her belief about off-label benefits to information from sales representatives in Washington. Id. at 173.

[14] Deposition of Charles L. McGill, M.D., at 74-75 (docket no. 146, ex. 79).

17 [15] Deposition of Alfons Leander Fontaine, 3/30/05, at 188 (docket no. 146, ex. 11) (testifying that the "core labeling team" for hormone therapy is located in Pennsylvania).

18 [16] See Deposition of Gail Ludmerer, 5/26/05, at 556-557 (docket no. 146, ex. 10) (testifying that she holds the position of Wyeth's Senior Director of Market Research and her business address

19 is in Pennsylvania); Memorandum in Support of Wyeth's Motion to Certify Question to Minnesota Supreme Court and Motion for Summary Judgment Re Statute of Limitations, No.

20 4:03-CV-1507, In re: Prempro Products Liability Litigation (Fleeger v. Wyeth, et al.) at 3, (E.D. Ark. Oct. 20, 2008) (stating that Pennsylvania is the location of "the employees who have

21 principal responsibility for testing, warning about, and marketing hormone therapy").

[17] FDA Letter to Joseph S. Sonk, Ph.D., Senior Director, Women's Health Care Products (docket

22 no. 146, ex. 75).

[18] Declaration and Expert Report of Suzanne Parisian, M.D., at 23 (docket no. 146, ex. 36).

23

ORDER - 11

1  Pennsylvania.[19]  In sum, any contact between Wyeth sales representatives and doctors in

2  Washington does not provide a compelling basis to distinguish this case from <u>Singh</u>.[20]

3              **iii.    Domicile, Place of Business of the Parties**

4        The domiciles of the parties to this case are balanced.  Wyeth is incorporated in

5  Delaware with its principle place of business in Pennsylvania.  Mrs. Bryant is domiciled

6  in Washington.

7              **iv.    Where the Relationship is Centered**

8        In Washington, the "relationship between the parties, if any, must center around

9  the cause of action . . . ."  <u>Brewer</u>, 447 F. Supp. 2d at 1180 (quoting <u>Perry v. Aggregate

10 Plant Prods.</u>, 786 S.W.2d 21, 25 (Tex. App. 1990).  The place where the relationship is

11 centered is therefore often "the same as the place where the conduct causing [the] injury

12 occurred."  <u>Brewer</u>, 447 F. Supp. 2d at 1179-80 (citing <u>Zenida-Garcia</u>, 128 Wn. App. at

13 263).  For example, in <u>Zenaida-Garcia</u>, an Oregon resident was killed in Oregon by a

14 trommel that was manufactured by the defendant in Washington.  <u>Id.</u>  The defendant

15 argued that Oregon's shorter statute of repose should apply to bar the claim and the

16 plaintiff argued that Washington's longer statute of repose should apply.  The court

17 

18 [19] FDA Letter to Joseph S. Sonk, Ph.D., Senior Director, Women's Health Care Products (docket no. 146, ex. 75).

19 [20] Contrary to Wyeth's argument, this case is distinguishable from <u>Sadler v. State Farm Mut. Auto. Ins. Co.</u>, C07-995Z, 2007 WL 2778257 (W.D. Wash. Sept. 20, 2007), where "the bulk of the conduct allegedly causing the injury took place in Washington."  There, Washington

20 plaintiffs claimed breach of fiduciary duty, intentional misrepresentation, and the tort of outrage against an Illinois-based insurance company.  <u>Id.</u> at *2-4.  The Court dismissed the claim for

21 punitive damages under Illinois law because the plaintiff did not allege a sufficient connection between the nationwide policy decisions made in Illinois and the plaintiff's harm in Washington.

22 <u>Id.</u> at *6.  In contrast, Mrs. Bryant's fraud claim relates directly to conduct that occurred in Pennsylvania.

23 

ORDER - 12

1  applied Washington's statute of repose, concluding that the relationship between the

2  parties was centered where the trommel was designed and manufactured because "the

3  cause of action is negligent and unsafe design of the trommel." Id. at 263.  Here, the

4  cause of action is fraud, stemming from wide-spread dissemination of allegedly false

5  information.  Wyeth disseminated this information from Pennsylvania, centering the

6  parties' relationship there for the issue of punitive damages.

7          The Court concludes that Pennsylvania law applies to the issue of punitive

8  damages because the location of the conduct that caused Mrs. Bryant's injury is the most

9  significant contact for this fraud claim.

10          **(d)  Interests of Each State**

11          The Court finds that the policy interests of the two states also favors the

12  application of Pennsylvania law.  "The extent of the interest of each potentially interested

13  state should be determined on the basis, among other things, of the purpose sought to be

14  achieved by their relevant local law rules and the particular issue involved." Southwell v.

15  Widing Transp., Inc., 101 Wn.2d 200, 204 (1984) (citing Johnson, 87 Wn.2d at 582).

16          In Pennsylvania, the "purpose of punitive damages is to punish a tortfeasor for

17  outrageous conduct and to deter him or others like him from similar conduct." Hutchison

18  ex rel., 582 Pa. at 121-22 (citations omitted).  This defendant-focused rationale solidifies

19  the place where the conduct occurred as the most significant contact. See Specialty

20  Surplus, 2006 WL 581024, at *2.  In Specialty Surplus, this Court applied New York's

21  punitive damages law to an insurance bad faith claim even though it was "arguable that

22  the only 'contact' with New York is the location of the adjusters used to oversee the

23

ORDER - 13

1  claims." Id.  The court reasoned that "since in the context of punitive damages it is clear

2  that the *defendant* is the focus of the analysis, the Court finds that the location of the

3  conduct causing harm is the most significant contact and outweighs the other contacts."

4  Id.

5        Pennsylvania has a strong interest in punishing Pennsylvania companies that

6  commit fraudulent conduct within its borders.  Washington has a strong policy against

7  punitive damages, but "it has no interest in protecting companies that commit fraud."

8  Singh, 151 Wn. App. at 140, 148; see also Kammerer, 96 Wn.2d at 422.  The conduct

9  that "serves as the basis of the punitive damage award," occurred in Pennsylvania, Singh,

10  151 Wn. App. at 148, and "Washington has no interests superior to or inconsistent with

11  the interests of [Pennsylvania] in this controversy . . . ."  Kammerer, 96 Wn.2d at 422

12  (citing Kammerer v. W. Gear Corp., 27 Wn. App. 512, 520-21 (1980).  Thus,

13  Pennsylvania punitive damages law applies to Mrs. Bryant's fraud claim against Wyeth.

14        **2.   Failure of Proof on Product Identification as to Defendant Upjohn**

15        Upjohn moves for summary judgment, arguing that Mrs. Bryant has failed to offer

16  evidence that she ingested Upjohn's Provera rather than a generic MPA manufactured by

17  another company.  Specifically, Upjohn argues that Mrs. Bryant has not produced any

18  pharmacy records demonstrating that she received Provera and points to the deposition

19  testimony of one of her physicians stating that he "typically give[s] a generic

20  medroxyprogesterone if [he is] using that product."  Deposition of Dr. Bynum at 55

21  (docket no. 89, ex. 13).  Upjohn argues that Mrs. Bryant must produce evidence that she

22

23

ORDER - 14

1 | actually received and ingested Provera.  Reply in Support of Defs' Motion for Summary

2 | Judgment at 11 (docket no. 162).

3 |      "[U]nder traditional product liability theory, the plaintiff must establish a

4 | reasonable connection between the injury, the product causing the injury, and the

5 | manufacturer of that product."  Bratten v. Saberhagen Holdings, 165 Wn.2d 373, 396

6 | (2008).  Thus, Mrs. Bryant must set forth some detailed facts or other evidence to support

7 | her claim that she was harmed by Upjohn's product.

8 |      Mrs. Bryant testified at deposition that she remembered taking Provera.  Bryant

9 | Deposition at 151 (docket 146, ex. 23) ("Q And do you remember that you were taking

10 | both Premarin and Provera? A Yes.").  She stated in an affidavit that she recalled the

11 | label on the Provera pill bottle and the shape and color of the pill.  Bryant Affidavit at 1-2

12 | (docket 146, ex. 84).  Mrs. Bryant also produced medical notes from two office visits

13 | with Dr. Cuda that state she was taking Provera at the time of those visits.  Docket 146,

14 | ex. 83.  Viewing the record in the light most favorable to the plaintiff, genuine issues of

15 | material fact exist as to whether Mrs. Bryant ingested Provera.  As a result, the motion to

16 | dismiss the claims against Upjohn for failure of proof is denied.

17 |     **3.  Breach of Express Warranty**

18 |      The WPLA provides for strict liability if a "claimant's harm was proximately

19 | caused by the fact that the product . . . was not reasonably safe because it did not conform

20 | to the manufacturer's express warranty."   RCW 7.72.030(2).  In her complaint, Mrs.

21 | Bryant alleges that

22 |

23 |

ORDER - 15

1

2
> [d]efendants, through description, affirmation of fact, and promise expressly warranted to the FDA, prescribing physicians, and the general public, including the plaintiff, that their hormone therapy products were both efficacious and safe for the intended use.

3

4
Third Amended Complaint at 49 (docket no. 163).  She claims that these warranties came

5
in the form of publicly made written and verbal assurances, press releases, media

6
interviews, promotional pamphlets and brochures directed to consumers, advertisements,

7
and the product information included in the *Physicians Desk Reference*.  Id. at 49-50.

8
Washington law defines an express warranty, inter alia, as "any affirmation of fact

9
or promise."  RCW § 62A.2-313(a).  To state a claim for express warranty under the

10
WPLA, Plaintiffs must show that (1) the warranty was made part of the basis of the

11
bargain; (2) the warranty relates to a material fact concerning the product; and (3) the

12
warranty turns out to be untrue.  7.72.030(2)(b).

13
Defendants' argue that the Court should dismiss this claim because Mrs. Bryant

14
has failed to offer evidence that Defendants' made any express warranty that was part of

15
the "basis of the bargain" and "later proved to be untrue."  Defendants' also argue that

16
Mrs. Bryant has provided no evidence that any of her doctors relied on an express

17
warranty in prescribing E+P.  See Reece v. Good Samaritan Hosp., 90 Wn. App. 574,

18
585 (1998) (breach of express warranty claim legally insufficient where there was "no

19
evidence that [the plaintiff] relied on the alleged express warranty").

20
Mrs. Bryant does not respond directly to this argument in her summary judgment

21
response.  Reading the Third Amended Complaint and Mrs. Bryant's response brief

22
together in the light most favorable to her, she appears to argue that Defendants expressly

23

ORDER - 16

1  warranted that CHRT was safe for use by women suffering from menopause through

2  their advertising, marketing, and product labeling.  Again, taken in the light most

3  favorable to Mrs. Bryant, she appears to argue that Defendants breached their warranties

4  by providing her with prescription medications that were in fact more dangerous and

5  detrimental to her than she expected.

6       The only specific statement identified by Mrs. Byant that the Court believes could

7  reasonably be construed as an express warranty is the warning label appended to the

8  medications and included in the *Physicians Desk Reference*.[21]  That statement reads, in

9  relevant part,

> Some studies have reported a moderately increased risk of breast cancer
> (relative risk of 1.3 to 2.0) in those women on estrogen replacement therapy
> taking higher doses, or in those taking lower doses for prolonged periods of
> time, especially in excess of 10 years. The majority of studies, however,
> have not shown an association in women who have ever used estrogen
> replacement therapy. The effect of added progestins on the risk of breast
> cancer is unknown, although a moderately increased risk in taking
> combination estrogen/progestin therapy has been reported. Other studies
> have not shown this relationship. In a one-year clinical trial of PREMPRO,
> PREMPHASE and Premarin alone, 5 new cases of breast cancer were
> detected among 1377 women who received the combination treatments,
> while no new cases were detected among 347 women who received
> Premarin alone. The overall incidence of breast cancer in this clinical trial
> does not exceed that expected in the general population.

See Third Amended Complaint at 35 (docket no. 163).

       Generally, an "'express warranty' is an affirmation of fact which may tend to

induce buyer to purchase, or a promise by the seller upon which buyer relies when

---

[21] The Court notes that Mrs. Bryant does not actually argue anywhere in her brief that this is an express warranty.

ORDER - 17

1   making the purchase."   McDonald Credit Service, Inc. v. Church, 49 Wn.2d 400 (1956).

2   The Court concludes that the above label cannot fairly be said to be an "affirmation of

3   fact" or a "promise by the seller."  The label provides general statistical information

4   about the risk of breast cancer from CHRT, not a promise or factual representation about

5   its safety.

6          Moreover, Mrs. Bryant fails to demonstrate that any warranty was part of the

7   "basis of the bargain."  She points to no evidence that she or her physicians decided to

8   use E+P because the Defendants' "warranted" the safety of their product in a particular

9   way, or, that her physicians would not have prescribed the drugs without this alleged

10  express warranty.  For the above reasons, and because Mrs. Bryant makes no argument to

11  the contrary, the Court concludes that the CHRT warning label does not constitute an

12  express warranty.  Plaintiff's cause of action as to express warranty is dismissed.

13     **4.  Conclusion**

14         For the foregoing reasons, the Court GRANTS in part, DENIES in part, and

15  DEFERS in part Defendants' Motion for Summary Judgment (docket no. 89).  The Court

16  concludes that Pennsylvania law applies to any claim for punitive damages based on

17  fraud against Wyeth and DENIES Defendants' motion to dismiss the claim for punitive

18  damages.  The Court concludes that Mrs. Bryant has produced sufficient evidence of

19  product identification with respect to Defendant Upjohn to create an issue of material fact

20  for trial and DENIES Defendants' motion as to that issue.  Plaintiff has not demonstrated

21  that the product label or other affirmative action of Defendants constitutes an express

22  warranty and the Court therefore GRANTS Defendants' motion to dismiss Plaintiff's

23

ORDER - 18

1   claim for breach of express warranty under the WPLA as to all defendants.  The Court

2   DEFERS the question of whether Plaintiff's fraud claim should be dismissed.  The Court

3   will allow oral argument on that issue at the hearing now scheduled for September 10,

4   2012.  The Court renotes the motion to dismiss, docket no. 89, to September 10, 2012.

5          IT IS SO ORDERED.

6          Dated this 19th day of July, 2012.

7

8          _____
           THOMAS S. ZILLY
9          United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

ORDER - 19